*19 Statement of the Case.
MONROE, J.
On the basis of a total in-
surance of $32,200 on a stock of merchandise, and an alleged loss in excess thereof, plaintiff recovered judgment against defendant for $1,000 on its policy for that amount, with interest and damages as provided by Act No. 368 of 1908. Defendant originally denied liability on the grounds that plaintiff had failed to comply with “the iron-safe clause,” had been guilty of misrepresentation and false swearing, had intentionally burned, or caused to be burned, the property insured, and that the act of 1908, if applied to the contract sued on, would be unconstitutional. Thereafter, by supplemental answer, defendant abandoned the charge of arson (for the reason that a criminal prosecution, based on that charge, had resulted in the acquittal of the accused), and confined itself to the other defenses mentioned.
The policy in question covered the period between November 25, 1907, and November 25, 1908. The fire occurred August 30, 1908. This suit was instituted December 30, 1908. The supplemental answer was filed April 22, 1909, and in May following Mr. Samuel Marcuse was examined by consent as a witness for plaintiff, for the reason, as stated, that he was about leaving the city, the sole purpose apparently being to show by him that during the period from April 1, 1905, to January 1, 1908, plaintiff had made certain profits in its business, from which, it might be deduced that, deducting such profits, or even larger profits, from the cost of the goods which went out after the date last mentioned, there is nothing improbable in plaintiff’s claim as to the quantity or value of the goods that were on hand at the time of, and were destroyed by, the fire. Thus, according to plaintiff’s proof of loss, the value of the goods destroyed by the fire was $36,238.18, which value was arrived at, substantially, as follows:
Stock on hand, as per inventory,
Jany. 1, 1908...................$22,017 20
Purchases between Jany. 1, 1908, and Aug. 29, 1908............... 19,851 59
Expended for labor............... 16,386 45
“ “ fuel ............... 620 49
“ “ freight and drayage.. 2,577 18
Mdse, on storage and for repair.... 615 61
$62,008 52
Sales from Jany. 1, 1908,
to Aug. 29, 1908.....$38,655 50
Less profit 33%%...... 12,885 06 25,770 34
Net loss................... $36,238 18
Assuming that the figures showing the value of the stock on hand, as, also, those representing the purchases, expenditures and sales, are correctly stated, it would, of course, follow that, if there was no profit on the sales, the value of the stock burned would be found by deducting the entire $38,655.50 (representing the value of the goods sold) from the $62,008.52 (representing the amount received), and would be $23,353.02. Or if, instead of making a profit of 33% per cent., as appears from its sworn statement, plaintiff made a loss on its sales from January 1 to August 30, 1908, as defendant asserts, of 20.44 per cent., then we should have to add $7,935.65 to the $38,655.50, and, deducting the total of $46,591.15 from the $62,008.52, we should have $15,417.37 as the value of the goods on hand and burned. The question of the profit or loss made by plaintiff during the eight months preceding the fire is therefore of vital consequence in determining whether in making its proof of loss plaintiff swore truly or falsely in valuing the goods burned. And it was as bearing upon that question that the testimony of Mr. Marcuse was taken.
Mr. Marcuse testified that the plaintiff company was organized in April, 1905, with a capital of $5,000; that he was its president and bookkeeper, and so continued until about the end of the year 1907, and that the books were correctly kept; that between April 1, 1905, and January 1, 1906, the company made •a profit of $6,000, which was added to the *21 -capital; that he had recently examined the hooks, and from them had prepared a statement in order to facilitate him in testifying, .and he thereupon proceeded to testify with •-the aid of the statement so prepared. Upon his examination in chief he stated that, during the years 1905 (from April 1st), 1906, and 1907, respectively, the profits of the company were 29% per cent., 22% per cent., and 42% per cent. On his cross-examination he said that he owned one-third of the stock of the ■company; that he sold his stock to his partners in the firm of B. J. Wolf & Son (who, with him and Mr. J. J. Lips, appear to have •organized and constituted the company) at the close of the year 1907, because he was interested in, and was treasurer of, a company doing business in Panama; that the isale included his interest in the firm, and was made for a lump sum, and he “supposes” that he may “probably” have received $125 -or $130 per share for said stock. He further .gives figures and makes explanations from which' counsel for defendant conclude that tthe profits of the company could not during the period mentioned much have exceeded 17 .per cent. About a month after the testimony ■of Mr. Marcuse had been thus taken, the •case was called for trial, and counsel for plaintiff placed on the stand as their first witness Mr. St. Paul, an expert accountant •<who had been employed by the district attorney in connection with the criminal prose■cution to which we have referred, and who was then in the employ of the insurance companies), and elicited from him testimony to the effect that he had been furnished with plaintiff’s books up to the time of the fire, •and, so far as he could discover, they were ■correctly kept, but that he had been denied access to the books containing entries made .after the fire; that he was informed that the “work tickets” issued from January 1, 1908, to the date of the fire had been destroyed; -.that those tickets represented material and labor used upon outside jobs, etc. On his cross-examination he testified that there was no record kept by which it could be ascertained how much stock plaintiff had on hand at the time of the fire, or any book which showed the amount of labor and material which had been invested in contracts prior to the fire; that he asked for such a book, and they “said they had no record of it, and said there was no material outstanding in jobs outside of the building.” He was further interrogated, and testified as follows:
“Q. Mr. St. Paul, was it possible, from the records which were submitted to you by the Central Glass Company, to ascertain exactly the amount of profit which that company made after the taking of the last inventory and before the happening of the fire — -I mean during that period? A. Well, it was impossible to ascertain that for the mere reason that there was no inventory taken at the time of the fire of the net cost of the goods sold. Q. Therefore I understand you to say that the profit, if any was made, between the time of the taking of the last inventory and the happening of the fire, it was impossible for you, as an expert accountant, to ascertain from any books or records which they had? A. Yes, sir; it was impossible. * * * Q. Now, Mr. St. Paul, have you made a statement of the profits earned by the Central Glass Company during the years they were in business? A. Yes, sir. Q. Will you state, Mi-. St. Paul, how many years the Central Glass Company appeared to have been in business from their books? A. They went into business about the 1st of April, 1905, and I took up from that period of time to August 30, 1908, making, practically, four years almost. Q, Now, can you tell me, Mr. St. Paul, what the average profits were which were made by the Central Glass Company as shown by their books during the years 1906 and 1907?”
Counsel for plaintiff objected to the question as irrelevant and impertinent, and the court sustained the objection; and, after the examination of one other witness called by defendant, the case was continued over the summer vacation, and came up again in October (1909), when, after plaintiff had introduced the testimony of several witnesses to show that certain goods had been omitted from the inventory of January 1, 1908, and relating to some other topics, Mr. Jarreau, *23 its bookkeeper wbo bad succeeded Mr. Marcuse, was asked, on cross-examination:
“Now, will you turn to the books of the Central Glass Company for the year 1906, and tell us what the inventory was in the beginning of the year 1906?”
Whereupon counsel for plaintiff objected that the question was immaterial and irrelevant, and the objection was sustained; the court holding that the inquiry should be confined to the period between January 1, and August 30, 1908, and the ruling so made was thereafter adhered to throughout the trial. Plaintiff at that time called to the stand J. J. Lips, who had been its manager from the beginning, and one of its stockholders, and he testified that he had charge of all the glass department, and did practically all the buying, selling, and estimating for the concern, but had nothing to do with the management of its finances. In fact, he appears to have been the only member of the company who pretended to have had any knowledge or experience of the particular business in which the company was engaged. He was examined at considerable length with a view of establishing plaintiff’s claim, and was cross-examined, at still greater length, for the purpose of showing that by reason of the fact that important records such as pay rolls, estimate books, glaziers’ tickets, etc., had been destroyed by the fire, and for other reasons it was impossible to ascertain the profit realized upon the business done during the eight months preceding the fire without ascertaining, as a basis of comparison, the profit, if any, which had been realized during the two or three preceding years. The merchandise which had gone out of plaintiff’s establishment between the date of the last inventory preceding the fire and the date of the fire had been used in the execution of some 2,200 contracts or jobs (large and small), with respect to which there was little or no specific data, save a single line, in a book kept for that purpose, showing the number of the contract, the name of the party for whom the work was done, and the amount of money called for, and defendant was and is resisting plaintiff’s demand upon the ground, among others, that less of profit was earned and more of actual material used than is represented, and hence that there was less of material left behind to burn. The witness. testified that he furnished the figures which appear in plaintiff’s proof of loss, and, in effect, that he arrived at them by calculating the percentages of material, labor, freight, and drayage in each of the different contracts to which we have referred. Examined by plaintiff’s counsel, he testifies, at one time, as follows:
“Q. Í understand you to say that you furnished the' Central Glass Company — that is, their officers and their counsel — with a statement that the profits of the Central Glass Company were'between 40 and 50 per cent. That was before the definite amount was ascertained? A. I made that statement after I had calculated things, and they asked me and I told them it is between 40 and 45 per cent. Q. That was based upon calculations — not guesswork — was it? A. That was based upon what I had knowledge for the last year or two in my capacity with the Central Glass Company. Q. And you figured out that percentage? Á. That is what I figured. Q. Now, then, after-the answers were filed in this case, you were directed to ascertain specifically the profits, were you not? A, Yes, sir. Q. And you examined each transaction carefully, and figured' the profit upon each transaction? A. The glass, freight, drayage, and labor. Q. You figured the profits upon each transaction — figuring the glass, labor, freight, and drayage? A. Yes,, sir.”
Elsewhere, under cross-examination, he testifies as follows:
“A. There is nobody can figure a contract twice the same amount. Q. And few people-figure an estimate alike, do they? A. No, sir. Q. And labor is a very-difficult thing to figure? A. Yes, sir. * * * A. Yes, sir; you can make 10 estimates of the same thing, and I will defy you that you will make two of them, alike.”
The last testimony above quoted was given in connection with some, not very successful, efforts on the part of the witness to apportion the amounts called for by a few of the- *25 contracts to which we have referred into their different percentages of material, labor, and profit, and make the sums coincide with such amounts. The witness testified that from his experience in the business he estimated the percentage of the cost of labor to material in contracts for putting glass in buildings at from 10 to 15 per cent., but, when asked the percentage of the cost of ’beveling glass, he replied: “You couldn’t figure it.”
The cross-examination was apparently abbreviated to some extent by the intimation -of the learned trial judge that it would be necessary to appoint experts who would furnish the information which counsel were endeavoring to obtain, and, though defendant’s ■counsel did not approve of that course for the reason, as stated, that in their opinion the experts could accomplish nothing, if, under the ruling of the court, the books were not to be examined with regard to the business done prior to January 1, 190S, they subsequently concurred, in so far as to name one of the experts, the plaintiff naming the other, and the court naming an umpire, and instructing the parties so named that they were to ascertain from plaintiff’s books and records “the profits earned by plaintiff in the conduct of its business from January 1st to August 30, 1908,” and were to confine themselves to the books and records showing the business of that period. Counsel for defendant some time afterwards obtained from the court an order reading as follows:
“The Central Glass Company, Limited, plaintiff in the above-entitled cause, is hereby directed and ordered to furnish to the experts appointed in this matter a detailed statement showing the cost of material, the cost of labor and fuel, and the cost of freight and drayage, as calculated by the witness Lips, on such -contracts as the experts and umpire call for, and sales appearing in the book offered in evidence in this case and marked: ‘J. J. Lips, .A. A.’ ”.
At about the same time the expert who had been named by defendant (Mr. St. Paul) ■addressed a letter to plaintiff, saying that he was ready to begin work, but that Mr. Fortier (representing the American Audit Company, the expert named by plaintiff) seemed to be under the impression that he was to make his report to the umpire, without consulting with his coexpert.
“This [the letter goes on to say] is not my understanding of our functions as experts, and it is my belief and desire in this matter to confer and consult with Mr. Fortier on all matters before reference is made to the umpire.’.’
Several months later defendant appeared in court by rule alleging that a certain statement had been prepared by Mr. Lips, but that Mr. Fortier, representing plaintiff, refused to allow Mr. St. Paul, representing defendant, to examine it, and praying that plaintiff be ordered to show cause why For-tier should not be dismissed for improper conduct. When the rule was called for hearing, the trial judge declined to hear any testimony, dismissed the rule, revoked the order that he had made appointing the experts and the umpire, and at once reappointed Fortier and Mr. Elkin Moses (who had been the umpire) as experts. The judge was evidently impatient because of the slow progress which the experts appeared to be making with their work. Upon the other hand, the experts, having insufficient data, were unable to progress more rapidly. Lips, who had testified that plaintiff’s proof of loss was predicated upon figures furnished by him and which were the results of his calculating the cost of material, freight, drayage, fuel and profit, in and upon each of the 2,200 contracts representing defendant’s business between January 1 and August 30, 1908, and who had been ordered (through defendant) to furnish the experts with a detailed statement of those calculations, had never done so and never did so at any time, but he had furnished a statement containing some information, which went into the hands of Fortier and was used by him and Moses, but was denied to St. Paul, when he called for it; hence, the com *27 plaint set forth in the rule. The reasons assigned by the judge for dismissing the rule, and also dismissing St. Paul, are, in part, as follows:
“As the court understands it, it is now proposed for this court to try the disagreements between the expert selected by the defendant and the expert selected by the plaintiff and their disagreements with' the umpire. The court declines to hear any evidence on that question. This court is here to try the case of the Central Glass Company, Limited, against the German American Fire Insurance C9mpany. During the progress of that case it became necessary to appoint experts to examine the books of the Central Glass Company. There were two modes of making those appointments: One was the court could of its own motion have appointed its own experts, but, on the suggestion of counsel, the court adopted another way. The court permitted the Central Glass Company to name its expert, and they named the American Audit Company, which is a corporation. Neither the plaintiff nor the court understood or knew what individual would be selected by the American Audit Company as an expert in this ease. The defendant, the German American Insurance Company, much to the surprise of the court, selected as their expert a witness in this case, Mr. George St. Paul. Mr. St. Paul was a witness in this case, and from his testimony the court derived the impression, and believes, that he was employed by the defendant corporation to examine their books and was their expert before this suit was instituted. Pluman nature is human nature, and it was not to be expected by what he would probably endeavor to serve those that employed him or try to sustain the testimony that he gave upon the witness stand. Now the public time is too precious, and this court is not called upon, to try these disputes between experts. They were appointed October 27, 1909. They repeatedly applied for extensions of time to examine these books. Time has passed on, and no report has been made, and now, on March the 2d, it is expected for me to try the issue as to who is right between these experts and the umpire. The court positively declines to hear any evidence or to try any such question. The court will now revoke the order which was granted appointing these two gentlemen and Mr. Elkin Moses as the umpire, and now enters an order of its own motion that, having the utmost confidence in the American Audit Company and Mr. Moses, it appoints them, as the court’s experts, to take these books, to go through them, and make a report to this court as to what those books show. The court would appoint some person other than the audit company if it were not for the fact, after hearing the correspondence read on the returns here, that the court has confidence in the audit company, and does not desire to injure a company of that kind by revoking the-order appointing it.”
A few weeks afterwards the two experts, so appointed made their reports, which,, though made separately, are in effect the-same, and plaintiff ruled defendant to show-cause why the report should not be homologated, to which defendant answered that the-dismissal of the rule taken by it, the revocation of the original order appointing the experts and the umpire, and the reappointment of Fortier and Moses were unauthorized and. illegal, as defendant was denied the right to sustain its complaint by evidence; that during the trial defendant had been denied', the right to cross-examine Lips upon the-method adopted by him in arriving at the figures prepared by him, and that the conclusions reached by the experts as to the percentage of profits earned by plaintiff were-based entirely upon the figures furnished by said Lips, the correctness of which the experts had not examined. And there are some other minor matters set up which do-not require attention.
On the trial of the rule, Mr. Moses gave-the following with other testimony, to wit:
“Q. Has it not been universally the custom? with you, as an expert accountant, in arriving-at the amount of loss and in determining the-ratio of profits on sales, to consult the books of previous years, and find out your percentage in that way? (Objected to as immaterial and' irrelevant, and objection overruled.) A. As a general rule, I take the percentage of profits-for one or two or three years prior. Q. From-the books? A. Yes, sir. But I wish to set myself right in this case, and state my reason for not doing it in this case was in accordance with the instructions which were given in the ruling of the trial judge, whose authority is-, way ahead of my authority, and, for that reason, I had no reason to go to the previous years prior to 1908. By the Court: I think I. so instructed him. By Mr. Gidiere: Q. iu this case your work was done under the ruling of his honor, Judge King, but my question was. directed to work on previous losses, and I. wanted to find out from you whether it had not always been your custom as an accountant, in calculating these losses, to apply the profits, to the sales derived from transactions shown, in the bo'oks during previous years? A. To-which, Mr. Gidiere, I answer yes. Q. And, *29 this, Mr. Moses, is the first case, is it not, in your experience as an accountant, in which you have attempted to do otherwise? A. Don’t put that word ‘attempted,’ Mr. Gidiere. I don’t think it would be right to put that word ‘attempted.’ Understand it is a question of authority or instructions from a higher source than I am that simply has made me take the instructions of the court, but I don’t want to go down as ‘attempted,’ because that would be a reflection on me, and I don’t want it. Q. Is not this the first time you were ever directed to ascertain profits in this way? A. Yes, sir. Q. And at all other times you took them from the books? A. Correct.”
Mr. Moses also testified that the report of the audit company served as the basis of his report, but that he had gone over the calculations of the audit company, and cheeked them up, and had in many instances, and so far as he could, verified them by going to the original sources of information. Both he and Mr. Fortier (by whom the report of the audit company was prepared) admit that the principal source of information was Mr. Lips; so that to all intents and purposes the report of the experts upon the vital question at issue in the case is based upon the- figures furnished by Mr. Lips. This may be illustrated by the following excerpts from the testimony: First, of Mr. Moses, to wit:
“Q. How did you know anything about the salvage glass in the factory? A. The same way as before — took the figures given by Mr. Lips. * * * A. The only way that those items can be obtained is from those experts of the company in position to furnish you with the items. Q. By ‘experts of the company’ you mean Mr. Lips? A. Yes, sir. Q. And the officers? A. Only from Mr. Lips, because he was about the only one in position to furnish you with all that information. Q. So this Exhibit 15 [forming part of the report of the audit company] is really made up from information derived from Mr. Lips? A. The only information we could obtain, unless we would go on the outside and ascertain from other experts, on the outside, what would be the approximate cost of labor of that kind. * * * Q. Now, will you turn, Mr. Moses, to * * * Exhibit 18, which is headed ‘Merchandise on .outside contracts’? Where did you get the information in regard to the merchandise that was outstanding? A. Through Mr. Lips.”
Mr. Fortier testifies to much the same effect, thus (by way of illustration):
“Q. Now, in making up this report, Mr. For-tier, you have had to place absolute confidence in the estimates furnished you by Mr. Lips, hadn’t you? A. Yes, sir. Q. If Mr. Lips’ estimates are wrong, of course, your report is wrong? A. The report is wrong, too — that is, to the extent that it refers to the estimates only.”
Mr. St. Paul testifies, in part, as follows:
“Q. Do I understand you to say, Mr. St. Paul, that you disagreed absolutely with the approval of the experts in adopting the prime cost of glass obtained from Mr. Lips, as a basis for making up their report? A. Yes, sir. * * * Q. Now, I want to ask you from your examination of the books in this case is it possible to ascertain, with any certainty, as an accountant, what profits were earned by the Central Glass Company from the time of the taking of the last inventory up to the time of the fire? A. It was not. It is not. * * * Q. Now, I want to ask you as an expert accountant whether it is possible for you to ascertain with any accuracy what the prime cost of glass is which should enter into the various contracts of the Central Glass Company, after the last inventory, up to the time of the fire? A. No, sir. * * * Q. It is impossible to ascertain how much labor went into each contract? A. Yes, sir. Q. It can’t be done? A. No; there is no system by which.it could be done.”
The defendant called as a witness Mr. Joseph Weckerling, who testified that he had for over 14 years been in a business in New Orleans, which appears to be the same as that in which plaintiff was engaged; that the competition in that business in the year 1908 was very keen, more so, perhaps, than in previous years; and that the profits were smaller. 1-Ie was then asked:
“Q. Now, Mr. Weckerling, is it possible in your business to start with the last inventory which you took, say, the 1st of January, 1908, and take every sale and contract which you had and calculate the cost of glass and the cost of labor on these various contracts — taking the cost of material in each contract and estimating the amount of labor which ought to be allowed in each contract, and freight and drayage, to arrive, with any precision, at the general profits in your business?”
*31 The question was objected to as irrelevant and immaterial, and the objection was sustained, on the ground that:
“To permit the question to be answered by the witness would be to allow him to give bis opinion as to the manner in which the business of the plaintiff has been conducted, based upon and compared with Ms own business. * * * ”
The witness was then asked:
“Q. Now, Mr. Weckerling, in asking you that previous question, I said, ‘could you, in your business.’ By the words ‘your business’ I mean in the general glass business; could that calculation have been arrived at?”
The question was objected to and the objection was sustained.’ Counsel for defendant then said:
“Your honor will permit me, as I understand, to ask him, irrespective of his particular business, whether they could be calculated in the general glass business? By the Court: That is exactly what my ruling is, that you cannot do it, that it is a comparison of the general glass business with this business, and I say that you cannot decide this case on the business of one concern compared with another. By Mr. Gidiere: Counsel’s object in putting this witness on the stand was, as an expert, to testify whether such calculations could be made in the glass business. The same ruling would apply to that? By the Court: Yes; that is my view of it.”
Counsel for defendant then exhibited to the witness the document marked “Lips 3,” purporting to show, without detail, the gross amounts expended and received upon the various contracts which have been heretofore referred to, and he was asked whether such profits as those shown could have been made, in the glass business in 1908, and his reply was:
“I don’t think they could. * * * That is my opinion. * * * I am telling you now what is usual in the glass business. You can’t make that much profit. Q. You are telling me you can’t make that much profit. You had no such organization as the Central Glass Company, had you? A. I don’t know. We were in the same business, I think.”
It may be here stated that, plaintiff having declined or failed to offer in evidence the testimony of Marcuse, it was offered by defendant, but was admitted subject to the ruling that the court would not go into the question of profits earned by plaintiff prior to January 1, 1908.
Opinion.
The judge a quo considered, as do we, that the decision of the case depends upon the determination of the question whether the profit with which plaintiff is credited in its proof of loss is correct or inflated, and in his written opinion he enters upon the discussion of that question as follows:
“The character of business conducted by the Central Glass Company was such that the profits on each transaction could be definitely ascertained. Thus, by taking the cost of the raw material and adding the freight, drayage, labor, etc., representing the actual outlay as against the sale or contract price; the difference being the gross profit earned. The books recorded some 2,200 transactions between the 1st of January, 1908, and the 30th of August, 1908. Each of these transactions was analyzed by Mr. Lips, and are embodied in the document submitted to the court as ‘Lips A. A.’ It shows that the gross profits were largely in excess of the profits claimed by the plaintiff to have been earned.”
[1] The plaintiff was ordered to prepare and furnish a statement containing an analysis such as that to which the learned judge refers, but it never complied with the order. What it did was to furnish a statement in which, a single line being devoted to each of the contracts in question, there is entered in one column a lump sum representing the amount expended (including the cost of material), and in another column a lump sum representing the amount received, and the respective columns being added, the expense column amounts to $19,359.13, and the receipt column to $3S,527.07, from which plaintiff deduces a profit of $15,9-10.47. Mr. Lips was cross-examined upon the figures thus given, and said that the $19,359.13 was made up of material, labor, freight, and drayage, but that he could not say how much of it was for labor or how much for freight; that he allowed — meaning that he estimated — the labor at “between 12 and 15 per cent.” on each item and the freight at 12 per cent. *33 on. window glass, and 15 per cent, on plate glass; his estimates being predicated upon his experience. Elsewhere, he says, as we have seen, that, in making 10 estimates upon a contract such as these in question he would not be likely to reach the same result twice, and that admission was made, because, in several attempts, while on the stand, he was unable to arrive at the figures contained in his statement. Mr. St. Paul testified that, with the data at their command, and for reasons which he gives at length, it was impossible for the experts definitely to ascertain the profits on each transaction. Mr. Weckerling, who has -had an experience of over 14 years in the same business, was asked whether it could be done, and his answer was excluded; but he was allowed to testify, and did testify, that no such profit as that which plaintiff claims could have been made in 1908. On the other hand, Mr. Fortier expresses the opinion that the thing could be done, and says, in effect, that it has been done by him, in his report, and Air. Aloses seems to acquiesce in that view. The experts by their report, however, to a very large extent, adopt the estimates of Mr. Lips, and the judgment here made the subject of review adopts the report of the experts, so that, in effect, defendant is condemned by the very estimates made by plaintiff, with respect to which it charges plaintiff with fraud, misrepresentation, and false swearing. It will be remembered that Air. Aloses in stating where he obtained certain of the information upon which he relied in adopting the report of the audit company as the basis of his own report gives such testimony as this;
“Only from Mr. Lips, because he was about the only one in position to furnish you with all that information.”
[2] It is true that in some respects he found data whereby he was able to test the accuracy of the information furnished by Mr. Lips, but in other respects — respects which, as it appears to us, were vital to the result — there was no such data in existence. It is not surprising, therefore, that defendant should have found the method prescribed for the investigation of its charge of fraud and false swearing unsatisfactory, nor does it appear to us unreasonable that it should have asked that the doors be opened, in order that the verity or falsity of plaintiff’s affidavit to its proof of loss should be subjected to some test, in addition to that furnished by its reiteration of that affidavit as a witness in its own behalf. The course pursued was, and is, open to the further objection that the report, which constitutes the basis of the judgment in question, was prepared by two persons, one of whom (and the one whose report was adopted by the other) was named by plaintiff as its representative, whilst the defendant was wholly unrepresented. We confess that we are unable to follow the reasoning by which the judge a quo reached that result. It being a fact that Air. St. Paul was denied the use of a written instrument which was intended for his use, as well as the use of the other expert, it appears to us that defendant’s counsel pursued the proper course in complaining to the court, and that he should have been heard upon his complaint. If, after hearing, the court had found reason to be dissatisfied with the experts, or either of them, it might properly have discharged them, or either of them. But we find nothing in the record which authorized it to discriminate, ag it did, against defendant and defendant’s expert. All that was then known as to the relations between the expert and the defendant had been known when the former was named and appointed, and, though it is true that he had testified as a witness for defendant, it is also true that 'he was first called', and testified, as a witness for plaintiff. On the other hand, plaintiff's expert, who was reappointed, had at that *35 time been working as plaintiffs expert for some four months, and we can see no reason why, when the question of discharging the one or the other or both was to be decided, the feelings of the corporation should have been considered and those of the individual ignored. The point that is material to this case, however, is that the action taken left the work of preparing the report, upon which the court expected to predicate, and has predicated, its judgment, to be done by a body in which plaintiff was represented and defendant was not represented, a result which is wholly inadmissible. Upon the whole, we are of opinion that defendant should have been permitted to show from the records of plaintiff’s business the profits or losses made by it during the period from April 1, 1905, to the date of the fire. We are also of opinion that testimony as to profits earned by another concern engaged in the same business as plaintiff would be competent evidence for the purposes of the ease.
It is therefore ordered, adjudged, and decreed that the judgment which is here made the subject of review, as also the judgment of the district court, be annulled, avoided, and reversed, and that this case be now remanded to the district court, to be there proceeded with according to law and to the views expressed in the foregoing opinion; the costs of the appeal and of this application to be paid by plaintiff, and those of the district court to await the final judgment in the case.